T.C. Memo. 2021-64

UNITED STATES TAX COURT

KATHERINE MASON, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6919-16L, 7007-16L,     Filed May 20, 2021.
       7009-16L.

<u>Eric William Johnson</u>, for petitioners.

<u>Beth A. Nunnink</u>, for respondent.

---

[1] We consolidated two cases with this one: Katherine Mason, docket number 7009-16L; and Victor Mason, Deceased, Katherine Mason, Successor in Interest, docket number 7007-16L.

[*2]                      MEMORANDUM OPINION


HOLMES, Judge:  Victor and Katherine Mason owed back taxes.  They didn't deny it, but they said they didn't have the money to pay.  They submitted an offer to compromise the debt, and the IRS routed it to the part of the bureaucracy-- the Centralized Offer In Compromise Unit--that reviews these offers.  But another part of the IRS began sending collection notices to the Masons.  The Masons asked for a hearing with the IRS Appeals Office.  IRS Appeals is supposed to consider alternatives to forced collection at these hearings, including offers like the one that the Masons wanted.

What happened then is that the Centralized Unit didn't consider the Masons' offer, but returned it to them.  IRS Appeals didn't consider the merits of their offer either, but instead reviewed the decision by the Centralized Unit to return it.

The question presented is whether IRS Appeals abused its discretion by reviewing the Centralized Unit's decision for abuse of discretion instead of reviewing the Masons' offer on its merits.

We've had some similar cases, but never one quite like this.

**[\*3]**                                   <u>Background</u>

A.    <u>The Masons</u>

The Masons' troubles arose with their 2009 joint income-tax return.  They had reported adjusted gross income of $132,703 but filed the return almost a year late, and did not make a single payment towards their liability until July 2012, when they reached an installment agreement with the Commissioner.  They stuck to this agreement until March 2014, and paid a total of about $8,000 to pay down a $33,465 liability (not including penalties and interest).

Things got worse with their 2010 tax year.  They again filed their return late, and paid nothing on a tax bill of nearly $16,000.

Mrs. Mason began with tax year 2011 to file her individual income-tax returns separately from her husband, but these were also late and she again did not pay any tax due.  Mrs. Mason filed her 2012 return in May 2014, and it showed a tax liability of $21,667.  She filed her 2013 return in October 2014, and it showed a tax liability of $23,656.

Mrs. Mason also failed to pay trust fund amounts that her company owed.  Here's a table of these assessments against her:

[*4]

| Period | Amount |
|--------|--------|
| Dec. 31, 2011 | $995 |
| Dec. 31, 2012 | 1,305 |
| Mar. 31, 2013 | 7,385 |
| Dec. 31, 2013 | 4,944 |
| Mar. 31, 2014 | 6,767 |
| Total | 21,397 |

The grand total of their four years of delinquency and failure to pay was a liability of more than $155,000. This comprised unpaid joint tax liabilities for 2009 and 2010, for Mrs. Mason's individual income-tax liabilities for 2012 and 2013, and for Mrs. Mason's liabilities for trust-fund-recovery penalties for 2011, 2012, 2013, and 2014.[2]

---

[2] Taxes that employers withhold from their employees' wages are known as "trust fund taxes" because they are deemed to be held in trust for the United States under section 7501(a). Slodov v. United States, 436 U.S. 238, 243 (1978). Mrs. Mason, in her role as owner of a small business named Vintage Moments, LLC, was a "responsible person" within the company, which means the Commissioner may collect unpaid employment taxes from her for her failure to pay over tax. Any amount of money collected on this liability is called a trust-fund-recovery-penalty tax. Sec. 6672. (Unless otherwise indicated all section references are to the Internal Revenue Code for the years at issue.) We note that for 2013, Mrs. Mason has penalty liabilities for two different quarters: one ending March 31 and one ending December 31.

[*5] B.        From Collection to Petition

The Commissioner began filing liens against the Masons' property at the end of 2014 and the beginning of 2015 after the Masons stopped paying under their installment agreement.  And, as the summer of 2015 neared, the Commissioner's collection efforts against the Masons began to heat up.

In May 2015 Revenue Officer (RO) Jacquelyn Jacobson made a field call to the Masons' home in Shoreview, Minnesota, so that she "could advise BOTH taxpayers" of the equity in their home.[3]  RO Jacobson told the Masons that the equity in their home was enough to cover their joint liabilities in full, plus some of the separate liabilities, and that "they would need to sell the home to pay off taxes."  She also told the Masons that if they "[were] not willing to place the house on the market, [the] IRS would seize the home as the next action."[4]  Following this nice-little-home-you-got-here-shame-if-something-happened-to-it field call, RO

---

[3] We note that at the time of this field call, Mrs. Mason had filed a Form 2848, Power of Attorney and Declaration of Representative, with the IRS authorizing her attorney to represent her.  Mr. Mason had not.  RO Jacobson was trying to make contact with just Mr. Mason, but ended up meeting with both of the Masons as "Katherine happened to be home when the field call was made."

[4] RO Jacobson apparently didn't mention that the IRS cannot seize a taxpayer's residence without first getting the approval of a Federal District Court judge.  See sec. 6334(e)(1).  Internal IRS guidance requires that the area director and area counsel for the IRS also give their approval.  Internal Revenue Manual (IRM) pt. 5.17.3.5.5 (Aug. 29, 2017).

**[*6]** Jacobson contacted the Masons' attorney to arrange another meeting with the Masons--this time with counsel present--at some later date.

On the same day as the field call, the IRS sent the Masons a notice that it intended to levy upon their property to collect their unpaid 2009 and 2010 joint tax liabilities. The IRS included with this notice of intent to levy (NIL) another notice that informed the Masons of their right to a collection due process (CDP) hearing. The Masons spared little time, and within two weeks completed an offer-in-compromise (OIC) and sent it off to the Commissioner's Centralized OIC Unit. The Masons offered to settle all of their tax debts--including the trust-fund-recovery penalties against Mrs. Mason--from 2009 to 2014 for $4,800, citing both "Doubt as to Collectibility" and "Exceptional Circumstances (Effective Tax Administration)" as their reasons for the offer. In a cover letter that they sent with the OIC, the Masons argued that while they had "substantial home equity," this equity was their "functional retirement savings that they will need to tap into in the coming years" because of Mr. Mason's current, and Mrs. Mason's fast-approaching, retirement. Their Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, laid out the specifics of their financial circumstances, including monthly income just slightly above their expenses, total equity of approximately $95,000 in all their real property, and

**[*7]** credit-card debt of nearly $17,000.  The Masons certified that they had "filed all required tax returns" up to the date the offer was made.

The Centralized Unit received the OIC on May 22, 2015, the same day that the Masons timely requested a CDP hearing for their 2009 and 2010 joint income-tax liabilities.  In their request for a CDP hearing, the Masons claimed they could not pay the tax and they checked the boxes on the form that stated they wanted an OIC or another installment agreement.  The Commissioner received their CDP requests on May 26.

When RO Jacobson caught wind that the Masons had sent an offer to the Centralized Unit, she drafted a Form 657, Offer in Compromise Revenue Officer Report, in which she concluded that the Masons submitted their offer "to delay collection action," and checked "yes" next to the question "[d]oes the offer appear to have been submitted 'solely to delay' collection?"  In reaching this conclusion, she noted the following:

1.    "Katherine had not filed 2014 and it[']s expected she will owe additional tax once the return is assessed;"

2.    Their  "home on Cannon Drive is in decent shape, it[']s older, [and] may need a new roof."  It is "valued at approx. $170k and the mortgage balance is approx. $30k;"

**[\*8]**    3.    "The taxpayers could find and afford rental housing in the same city/county for the same amount they are paying on their mortgage (approximately $1400/month);"

4.    Their "[o]ffer was submitted directly to OIC unit within two weeks of the taxpayers['] being advised" to sell their home or the "IRS would seize [it]" to pay their tax liabilities;

5.    "[F]rom August 2013 to September 2014, [Mrs. Mason] withdrew a total of $8,800 directly at casino[]s * * * . Had Katherine not been gambling, she would have funds needed to make estimated payments and pay her federal taxes each year;" and

6.    The Masons incorrectly included all of the married-filing-jointly and married-filing-separately liabilities on the same OIC, "which is incorrect, two OIC packages, fees and down payments needed to be submitted."

RO Jacobson also noted that Mrs. Mason had "attempted to secure financing" to borrow against the Masons' home but "was denied at three different banks." The report was approved by RO Jacobson's manager and then sent to the Centralized Unit.

The report had a predictable effect. The Centralized Unit returned the Masons' OIC on June 12, the day after it was received. The cover letter stated the reason, "We have determined that your offer was submitted solely to hinder or delay our collection actions which are expected to collect significantly more than the amount you have offered."

**[\*9]** Less than three weeks later, a different part of the IRS received their request for a CDP hearing about their 2009 and 2010 joint tax liabilities. The Masons' request for a CDP hearing plodded on its own way through the IRS and was assigned to Settlement Officer (SO) Patricia Rush on June 30, 2015.[5] The Masons had already tried to reach SO Rush (or whoever would be assigned to their case) before this time to discuss their returned offer. SO Rush contacted the Masons on July 10, and they communicated back and forth through August. SO Rush shared the Centralized Unit's reasoning for its return of the Masons' OIC, and explained why returning the OIC was proper under the IRM.[6] For their part the Masons again described their financial situation and continued to question how their OIC

---

[5] SO Rush's case activity record shows that the Masons' CDP hearing request was "requested" on May 26, "received" on June 16, "created" on June 17, and "assigned" on June 30. Though the form says the request was "received" on June 16, there is no dispute that the Commissioner physically received the Masons' Form 12153, Request for a Collection Due Process or Equivalent Hearing, on May 26. We therefore find that "requested" must mean the date the actual requests were received, and "received" could be a date when Appeals or a specific division of Appeals first input the requests in the system. The record seems to show at least some attempt to slow the processing of the Masons' CDP request before their OIC (which was submitted days before) was dealt with.

[6] SO Rush wrote that the Commissioner had followed IRM pt. 5.8.4.20(1) (May 10, 2013), which outlines the procedures for returning an "Offer Submitted Solely to Delay Collection." She also noted in her case activity record that, under IRM pt. 8.22.7.10.1.1 (Sept. 23, 2014), it is Collection which investigates the offer, and then Appeals makes a final determination by reviewing whether Collection's decision to return an offer was correct.

**[*10]** could have been returned as "solely to delay" collection action. They kept asking for someone to consider their OIC on the merits. Their lawyer even offered to resubmit in two parts--one for the joint tax liabilities and one for Mrs. Mason's liabilities.

On July 21 Mrs. Mason received a second NIL from the Commissioner. This one told her of his intent to levy upon her property to collect her unpaid income-tax liabilities for 2012 and 2013 and her trust-fund-recovery-penalty liabilities for 2011, 2012, 2013, and 2014. She again asked for a CDP hearing, and the Commissioner received her request on July 24, 2015. In this request, Mrs. Mason again claimed she could not pay the tax, disputed the tax liabilities, and also asked for an OIC or installment agreement.

All the while, the IRS began trying to take the Masons' property. The record shows confusion among IRS employees about whether levy was appropriate--and for which years and liabilities--given the Masons' pending OIC and CDP hearing. SO Rush contacted the Masons again on August 17, and she explained that the offer's return without consideration of its merits was appropriate because the offer did not indicate any "illness or special circumstances that would warrant the equity in assets not being considered" against the Masons' offer of $4,800.

[*11] On September 8, SO Rush held a hearing with the Masons on both related CDP requests–the one regarding their joint income-tax liabilities, as well as the more recent request for Mrs. Mason's individual income-tax and trust-fund-recovery-penalty liabilities. During the hearing the Masons made clear to SO Rush that they wanted her to consider the merits of the OIC that they had sent to the Centralized Unit. SO Rush did not do so, but again reviewed the IRM and told the Masons that the return of their OIC was proper and that their circumstances *had* been considered.[7] She did not independently review the offer on its merits herself and sustained the collection action against the Masons. There are several important things that we note about the case file at this point:

---

[7] The Commissioner argues that SO Rush "stated that the petitioners had not provided any information that the equity in the real property was needed for health and welfare of the taxpayer and the mere fact that they were old enough [to] retire was not a special circumstance." SO Rush's case activity record notes are unclear, however, about whether she actually ever even asked for this information or made clear that it was necessary for her to consider the Masons' offer. See Uribe v. Commissioner, T.C. Memo. 2014-116, at *8-*9. The record does show that the Masons' attorney stated clearly to SO Rush that "[Mrs. Mason] will have to retire soon--her daily work is exhausting, and requires repeated lifting/moving of patients. She has no formal education or other means of support." He also revealed Mrs. Mason's gambling addiction and how it has affected the Masons' finances. None of this had any effect, and SO Rush "sustained collection" on the same day that the Masons more clearly asked for her to consider their returned offer. This foreclosed the Masons from providing more information.

[*12] ● SO Rush had the full package of the Masons' OIC, including all their financial records when she made her decision--it was all attached to RO Jacobson's own report;

● this financial information was at that point less than three months old; and

● nowhere in the file is there *any* mention of *any* request by SO Rush for more information from the Masons to help her evaluate their offer on the merits.

Months passed.

On March 3, 2016, the Masons received notices of determination under section 6330. The notices made clear that during the hearing the Masons' "only concern was to have [their] offer which was returned by Collection investigated as a collection alternative." The notices went on to conclude that the Centralized Unit did not err by not considering the merits of the Masons' offer, because "[y]ou submitted an offer in the amount of $4,800 and have approximately $140,000 equity in real property," and because "[w]ithin two weeks of being informed by the * * * RO assigned to your case to s[ell] your real property to pay the equity toward your liabilities, you submitted your OIC directly to the centralized OIC unit."[8] SO Rush rounded out her notices by reminding the Masons that they only

_____

[8] IRM pt. 5.8.4.20 (Offer Submitted Solely to Delay Collection); IRM pt. 5.8.7.2.2 (Oct. 7, 2016) (Processable Returns). The IRM has since been updated to require that an Appeals officer confirm that the original determination that an

(continued...)

**[*13]** wanted Appeals to consider their original offer "which *had been returned* by collection" and had offered no other collection alternatives. (Emphasis added.)

The Masons timely petitioned our court. We held a very short trial in St. Paul[9] to address disputed items in the administrative record. The Commissioner hoped to introduce SO Rush's declaration identifying certain case activity records, as well as the records themselves, which surfaced at the eleventh hour. We ruled in the Masons' favor and excluded the documents from the administrative record.

## Discussion

When someone fails to pay tax, the IRS will assess the liability against her and send a notice and demand letter. Secs. 6201, 6303(a). After that, things only get worse for the taxpayer: Her tax liability will become a lien in favor of the IRS against all of her property, see sec. 6321, and then she'll receive a notice of intent to levy (a politely phrased letter that is nevertheless a threat to seize property to collect the tax owed). For more than twenty years, these threats have been

---

[8](...continued)
OIC was submitted solely to delay collection was correct. IRM pt. 8.22.7.10.5.9 (Aug. 9, 2017).

[9] The Masons lived in Minnesota at all relevant times, which means these cases are presumptively appealable to the Eighth Circuit. See sec. 7482(b)(1)(A).

**[*14]** accompanied by notices that a delinquent taxpayer is entitled to an informal administrative hearing, called a CDP hearing. Secs. 6330(a), 6331(d). CDP was created as part of a broader effort to address the concern that "taxpayers who get caught in the IRS hall of mirrors ha[d] no place to turn that [wa]s truly independent and structured to represent their concerns." See Lewis v. Commissioner, 128 T.C. 48, 60 (2007) (quoting 144 Cong. Rec. 14689 (1998) (Statement of Senator Roth)). To help break those mirrors, a CDP hearing must be conducted by an "impartial officer" who "has had no prior involvement in the determination and assessment of the underlying tax liability that is the subject of the hearing." Cox v. Commissioner, 126 T.C. 237, 251 (2006) (quoting Criner v. Commissioner, T.C. Memo. 2003-328, 2003 WL 22843085, at *8), rev'd, 514 F.3d 1119 (10th Cir. 2008). That officer may also "not engage in ex parte discussions of the strength and weakness of the issues of a case that would appear to compromise the Appeals officer's independence." Hoyle v. Commissioner, 136 T.C. 463, 470 (2011), supplementing 131 T.C. 197 (2008). As our caselaw has recognized, CDP is "more than just a rubber stamp for the Commissioner's determinations," see Lewis, 128 T.C. at 60; it offers taxpayers the protection of a fresh look at the circumstances of their cases to ensure that the requirements of all applicable laws and procedures have been met, that the issues they raised have

**[\*15]** been considered and addressed, and that any proposed collection actions balance the government's need for efficient collection of taxes with the taxpayer's concern that collection be no more intrusive than necessary, see Cox, 126 T.C. at 248 (citing section 6330(c)(3)).[10]

The Commissioner had reached the "we're taking your stuff" stage with the Masons, and what happened next is what led to the unusual circumstances of these cases. Taxpayers usually ask for a CDP hearing on a form that allows them to check a box if they want an alternative to forced collection, such as an installment agreement or an OIC. The record shows that the IRS put the Masons in fear of losing their home; they responded quickly with an offer sent directly to the IRS, but outside the CDP process. Just days later they asked the IRS agent who was in charge of giving them a CDP hearing to also consider their offer.

Neither part of the IRS considered the offer on its merits.

A.    Section 7122

The Code permits a taxpayer to make an OIC, and section 7122(a) gives the Commissioner very wide discretion to compromise tax liabilities. Sec. 7122(c)(1); sec. 301.7122-1(c)(1), Proced. & Admin. Regs. In an effort to "treat[] all

---

[10] Driving home this point is IRS Appeals's recent name change to "*Independent* Office of Appeals." See Taxpayer First Act, Pub. L. No. 116-25, sec. 1001(a), 133 Stat. at 983 (2019) (emphasis added).

**[*16]** taxpayers according to published standards of general applicability," the Commissioner has delegated decisions on whether to accept taxpayers' offers to "IRS employees, who are supposed to follow regulations and policies * * * but with a bit of discretion to * * * tinker at the edges if [they] find[] special circumstances." Brombach v. Commissioner, T.C. Memo. 2012-265, at *5; see also sec. 301.7122-1(f)(3), Proced. & Admin. Regs.

Taxpayers can offer to compromise their tax debt at many different points during the return-to-audit-to-assessment-to-collection lifecycle of their tax year. And the IRS's system has developed in a way that directs OICs to different IRS locations at different stages of collection. The Masons' case is a good example of this, as they not only sent their offer directly to the Centralized Unit, see IRM pt. 5.8.3.3 (Nov. 5, 2020), which is permitted, but then wanted SO Rush to consider it during their CDP hearing, which is also permitted. If the Masons felt so inclined, they could also have chosen to submit the offer directly to the RO on their cases.

The IRS recognizes three broad classes of OICs: those based on doubt as to liability, those based on doubt as to collectibility, and (a catchall third category) those made for the sake of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. The Commissioner's regulations and policies instruct

**[*17]** IRS employees to look at different factors for each of these three different kinds of offers. The Masons' offer was based on both doubt as to collectibility and for the sake of effective tax administration. The IRS analyzes doubt-as-to-collectibility OICs by calculating how much it thinks a taxpayer can pay, what it calls her RCP--reasonable collection potential. This calculation is fairly complicated, but its goal is easy to understand: It's the IRS's best estimate of what it could get by seizing and selling a taxpayer's property and then garnishing her income. See IRM pt. 5.8.4.3.1 (Apr. 30, 2015). The IRS generally will not accept an OIC that is less than the RCP without proof of special circumstances. Johnson v. Commissioner, 136 T.C. 475, 486 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013); Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517.

An OIC made for the sake of effective tax administration requires the IRS to predict whether collection in full would create economic hardship for the taxpayer. See sec. 301.7122-1(b)(3)(i), (iii), Proced. & Admin. Regs. The regulation gives as an example of economic hardship a situation where, "[a]lthough taxpayer has certain assets, the taxpayer is unable to borrow against the equity in those assets and liquidation of those assets to pay outstanding tax liabilities would render the taxpayer unable to meet basic living expenses." Id. para. (c)(3)(i)(C). If collection would not cause economic hardship, the IRS may still compromise a tax liability

[*18] to promote effective tax administration when the taxpayer identifies compelling public policy or equity considerations. See id. para. (b)(3)(ii). The IRS will accept an OIC for these reasons if the taxpayer demonstrates that "exceptional circumstances" exist in her situation and meets three requirements:

- the taxpayer must have remained in compliance since incurring the liability and must not have an overall compliance history that weighs against compromise;

- the taxpayer must also show that she acted reasonably and responsibly in incurring the liability; and

- the Commissioner must determine that other taxpayers would view the compromise as fair and equitable.

Sec. 301.7122-1(b)(3)(ii), (c)(3)(ii), Proced. & Admin. Regs.; Bogart v. Commissioner, T.C. Memo. 2014-46, at *10.

The Commissioner must consider a taxpayer's individual facts and circumstances in light of these principles, but he does have broad discretion in deciding whether to accept an OIC. See Bogart, at *11. The IRS also checks to see that an offer was submitted on the proper form--Form 656--and with the correct information and accompanying documentation.

The IRS doesn't consider all the OICs it receives the same way. See sec. 301.7122-1(d)(2), (g)(4), Proced. & Admin. Regs. Some offers it rejects on their merits. A taxpayer may choose to appeal a rejection within the IRS. Sec.

**[\*19]** 7122(d)(3)(A) and (B).  But there is an important distinction here--a *rejected* offer is one that the IRS has considered.  The IRS has another category of OICs that it *returns*.  See sec. 7122(d)(3), (g).  When an OIC is returned, the IRS has not considered it on the merits because the Commissioner has found it to be "submitted solely to delay collection," or because it is "otherwise nonprocessable," or because the taxpayer failed to submit information that the IRS requested before it would consider the OIC.  Sec. 301.7122-1(d)(2), Proced. & Admin. Regs.  The regulations say that a decision to *return* an OIC is final and unappealable:  "[T]he return of the offer does not constitute a rejection of the offer for purposes of this provision and does not entitle the taxpayer to appeal the matter to Appeals."  Id. para. (f)(5)(ii).[11]

The Masons' offer was returned, not rejected.  The IRS never reviewed it for doubt as to collectibility or effective tax administration because the Centralized Unit concluded that it had been "submitted solely to delay collection."  At this point we want to stress that we are not determining whether we think the Masons'

---

[11] The IRM provides for one narrow exception to this rule:  If an OIC is returned as "submitted solely to delay collection," the taxpayer may "request for a review of the decision to return the offer with the immediate manager" of the employee who made the decision initially.  IRM pt. 5.8.4.20.  This review is informal and not provided for in any statute or regulation.  Id.  There is nothing in the record of these cases to show whether the Masons either asked for or got even this level of review.

[*20] offer was submitted solely to cause delay. But we do think the Masons make a good point here: What does it mean for an offer to be returned as "submitted solely to delay collection?" We don't have much to go on, but the IRS's own IRM cautions--presumably because the consequence is unappealability --that a "determination that an offer is submitted solely for the purpose of delaying collection should be apparent to an impartial observer"[12] and that the team manager at the Centralized Unit must also independently determine that the return is appropriate. IRM pt. 5.8.4.20(1) (May 10, 2013). The IRM also gives a couple helpful examples of when an OIC should be returned: an OIC in which "[t]he taxpayer fails to address the issues or defects of the previously submitted offer," id. at (4), or a second OIC not materially different from a previous one, id. pt. 5.8.4.20.1(1), Example (2) (May 10, 2013): "The taxpayer submitted an offer for $10,000. The [Commissioner] computed the RCP to be $20,000. The *taxpayer refused to increase the offer* to the computed RCP. A rejection letter was issued, and the taxpayer did not appeal. One month later, the taxpayer resubmitted an offer for $10,100" (emphasis added). This leads us to believe that using this

---

[12] The IRM, while it provides helpful insight into inner IRS workings, does not have the force of law and gives no rights to taxpayers. Fargo v. Commissioner, 447 F.3d 706, 713 (9th Cir. 2006), aff'g T.C. Memo. 2004-13, 2004 WL 68398; Thoburn v. Commissioner, 95 T.C. 132, 141 (1990).

**[\*21]** reason to return an offer should place a high burden on the reviewing IRS employee to prove that there was, as the Masons argue, "no other conceivable motive in submitting the offer"--even given the Commissioner's wide discretion in this area. More interesting is the Masons' argument that (apart from such extreme examples) the Commissioner's reasoning is disingenuous, because the CDP process is aimed very deliberately to give most taxpayers an opportunity to delay collection by having the IRS take another look at how to collect tax debt or, in some cases, whether those debts are even owed.

B.     The Interplay Between Sections 6330 and 7122

We normally don't see appeals from the IRS's rejection or returns of OICs-- we don't have jurisdiction to review them, and after a taxpayer exhausts her remedies within the IRS, that's the end of the matter. Cf. Asemani v. IRS, 163 F. App'x 102, 105 (3d Cir. 2006). But there is one exception--Congress gave us jurisdiction to review the Commissioner's determination after a CDP hearing, and told taxpayers that they could raise collection alternatives such as OICs at those hearings. Sec. 6330(c); Reed v. Commissioner, 141 T.C. 248, 254 (2013), supplemented by T.C. Memo. 2014-41. The Code specifically tells a settlement officer who conducts a CDP hearing to address any relevant issues the taxpayer raises. Sec. 6330(c)(2). That doesn't mean that a taxpayer in a CDP hearing gets

[*22] any different standard for the Commissioner's consideration of the merits of her OIC--the settlement officer is governed by section 7122 and its regulations just as much as the Centralized Unit is. See Olsen v. United States, 414 F.3d 144, 150 (1st Cir. 2005). But it does mean we can review a determination to reject an OIC on grounds that would have triggered a *return* if the OIC had been submitted outside the CDP hearing process--for example, OICs from taxpayers who don't submit financial information after being asked to do so, sec. 301.7122-1(d)(2), Proced. & Admin. Regs.; cf. Loveland v. Commissioner, 151 T.C. 78, 88 (2018), or OICs from taxpayers who aren't current with their filing obligations, Reed, 141 T.C. at 256-57. The Masons are within this exception because they requested a CDP hearing[13] just days after submitting their offer to the Centralized Unit. In their request for a hearing, and again at the hearing, they asked that SO Rush consider their offer. SO Rush made clear in her notices of determination that she did not do so. We have jurisdiction to review this determination.

Because the Masons aren't challenging their underlying tax liabilities, we review the Commissioner's determination for abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000). This means that, instead of deciding

---

[13] Their first CDP requests concerned their joint income-tax liabilities for 2009 and 2010, while their offer was made for all their outstanding tax liabilities from 2009 through 2014. See supra p. 6.

**[*23]** whether we think the offer should have been accepted, we look to see whether the Commissioner's decision was grounded in an error of law or rested on a clearly erroneous finding of fact, or whether he ruled irrationally. Fargo, 2004 WL 68398, at *2. Our review is also governed by the Chenery doctrine.[14] See Jones v. Commissioner, T.C. Memo. 2012-274, at *15; Salahuddin v. Commissioner, T.C. Memo. 2012-141, 2012 WL 1758628, at *7. Applying Chenery in a CDP case means that we can't uphold a notice of determination on grounds other than those actually relied upon by the IRS officer who made the determination. See Chenery I, 318 U.S. at 87-88; Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) (agency has the responsibility to articulate its reasoning); Salahuddin, 2012 WL 1758628, at *7 ("[O]ur role under section 6330(d) is to review actions that the IRS took, not [the] actions that it could have taken"). Those grounds must be clearly set forth so that we do not have to guess about why an officer decided what she did. See Chenery II, 332 U.S. at 196.

The Commissioner argues that the question we should ask is whether the SO abused her discretion when she determined that the Centralized Unit followed the

---

[14] The Chenery doctrine is an administrative-law principle that says a court, in reviewing a determination which an "administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." See SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 196 (1947); SEC v. Chenery Corp. (Chenery I), 318 U.S. 80 (1943).

**[\*24]** IRM in returning the Masons' OIC. We agree a bit with the Commissioner: Taxpayers have no right to appeal the *return* of an OIC. Reed, 141 T.C. at 255. But this also means that SO Rush tripped on a threshold question of law. By researching the IRM on whether the Centralized Unit was correct in returning the Masons' OIC and then determining that it was, she was asking and answering a question that isn't supposed to be the subject of a CDP hearing at all. She was also making a determination that we wouldn't be able to review--when a settlement officer makes a decision on a precluded issue, that decision is not properly part of the CDP hearing. See sec. 301.6330-1(e)(3), Proced. & Admin. Regs.[15]

This doesn't mean, however, that the Commissioner wins. Section 6330(c)(3)(B) requires the settlement officer to take into consideration issues that a taxpayer raises, which section 6330(c)(2)(A)(iii) specifically says include collection alternatives like an OIC. And we can be sure that the Masons raised the issue of an OIC because they checked that box on Form 656 to ask for a CDP

---

[15] We want to be as clear as possible that this does not mean we'd lack *jurisdiction* to review a notice of determination that said such a thing. In Reed we rejected the Commissioner's arguments that we lacked jurisdiction to review the return of an OIC. We held that "it is fundamental that we have jurisdiction in collection matters if the Commissioner issues a determination notice and a taxpayer timely files a petition." Reed, 141 T.C. at 253.

[*25] hearing and because SO Rush acknowledged in the notices of determination that they wanted their "offer which was returned by Collection investigated as a collection alternative."

This doesn't mean that the Masons necessarily win either, because it isn't enough for taxpayers to say that they want a collection alternative to have one considered. A settlement officer must actually have an OIC in front of her for it to be "a relevant issue" raised by a taxpayer. Reed, 141 T.C. at 254-55; Kendricks v. Commissioner, 124 T.C. 69, 79 (2005); see also Sullivan v. Commissioner, T.C. Memo. 2009-4; Scharringhausen v. Commissioner, T.C. Memo. 2008-26, 2008 WL 382337, at *1. This means we must figure out what the record shows about whether the Masons actually placed an offer on the table for SO Rush to consider.

We know that the Masons didn't submit the OIC package to the settlement officer again. But they did know she already had it, and she referred to it in calls with their lawyer. Is that good enough? For this, we need to look closer at our caselaw. In Kendricks, 124 T.C. at 73-74, the taxpayers argued that although they did not present an OIC directly to the settlement officer during their CDP hearing, they had still made an OIC while that hearing was pending. They argued that this meant it should have been considered. They conceded that they did not raise any collection alternatives at the CDP stage, but still believed they'd made an

[*26] acceptable OIC and it was just pending elsewhere with the IRS. Id. at 76. We held that the Commissioner had not abused his discretion by not considering an "offer in compromise [that was not] before Appeals." Id. at 79. But in Kendricks the settlement officer specifically asked the taxpayers at their CDP hearing whether they would like to submit an OIC, and they declined. Id. at 73. Only after the hearing did they submit an OIC to the Centralized Unit, and they never bothered to tell the settlement officer that they had done so. Id. at 73-74.

Our decision in Kipp v. Commissioner, T.C. Memo. 2015-7, was similar. We held there that the settlement officer did not abuse his discretion by failing to consider two OICs that had been returned more than a year before, and that the taxpayers had not requested be reconsidered. Id. at *9. That settlement officer had invited the taxpayers to submit an OIC, but all he got in return was updated financial information, and even that was incomplete. Id. at *4. The settlement officer specifically requested the missing financial information, and said he'd consider an OIC if he received it. Id. at *3. We again held it was not an abuse of discretion for the settlement officer to sustain the collection action after the taxpayers failed to respond to his requests for additional information. Id. at *9.

What we take from these cases is that a settlement officer is not required to consider a collection alternative that the taxpayer does not present to her. But

**[\*27]** what if a taxpayer serves up an OIC that's already been returned? We've seen this before in <u>Reed v. Commissioner</u>, 141 T.C. 248, <u>Crosswhite v. Commissioner</u>, T.C. Memo. 2014-179, and most recently in <u>Galloway v. Commissioner</u>, T.C. Memo. 2021-24. <u>Reed</u> was a case of first impression, where the taxpayers declined an invitation to submit a new OIC during their CDP hearing and instead wanted "us to adopt the theory that respondent can be required" to "reopen" an OIC based on doubt as to collectibility that was returned *years* before a CDP hearing. <u>Reed</u>, 141 T.C. at 254 (emphasis added). We held it was not an abuse of discretion for a settlement officer to refuse to review a 2008 OIC in 2011. <u>Id.</u> at 255. We reasoned that finding otherwise would "impermissibly expand the Commissioner's authority by allowing [him] to evaluate an OIC based on doubt as to collectibility using a taxpayer's past financial circumstances." <u>Id.</u>

The Code tells us that any OIC raised in a CDP hearing is to be considered independently (not just reviewed) by a settlement officer. And the cases tell us that taxpayers have the burden of placing an OIC before the settlement officer and making it clear that--even if there is an offer floating elsewhere in the IRS abyss-- they want it considered in CDP as well. Indeed, the IRM recommends consolidating pending requests from the same taxpayer for an OIC with the CDP process. In both <u>Scharringhausen</u> and <u>Kendricks</u>, the only reason a pending OIC

[*28] wasn't also considered in CDP was that the taxpayer didn't ask for it to be. A taxpayer shouldn't be deprived of her full CDP rights merely because she just so happened to first submit an OIC to the Centralized Unit and then also submit it within CDP.

Our decision in Crosswhite v. Commissioner, T.C. Memo. 2014-179, was similar. In that case, the taxpayer had submitted an OIC to the Centralized Unit, but it was returned because he was not current on his tax obligations. Id. at *7. During a CDP hearing more than five years later, the taxpayer requested that his old OIC be reconsidered. Id. at *9-*10. The settlement officer responded that it could not be, but invited him to submit a new one. Id. at *10. The taxpayer did so, but insisted that the return of the original OIC be reviewed. Id. at *11-*12. The settlement officer relented and took a second look, but affirmed the Centralized Unit's decision to return the OIC. Id. at *15. We held that he was not required to reopen the years-old OIC, but having decided to do so, he did not abuse his discretion in determining that the Centralized Unit's decision to return the OIC was correct. Id. at *25-*26.

The situation in a recent opinion, Galloway v. Commissioner, T.C. Memo. 2021-24, was a variation on this theme. Galloway had submitted an OIC in 2017 that was rejected. Id. at *5. He administratively appealed that rejection to IRS

**[*29]** Appeals, which then sustained the rejection. Id. at *6. In 2018 the Commissioner began to try to collect the tax, and Galloway asked for a CDP hearing. Id. At the hearing he urged the Appeals officer to reconsider the old OIC that the IRS had already considered and rejected. Id. at *7. The Appeals officer declined to do so, but gave Galloway yet another opportunity to propose an OIC based on his current financial information; Galloway rejected the chance. See id. at *7-*8. We found no abuse of discretion in not giving the taxpayer whose OIC had been administratively appealed and rejected, and which had also grown old, another chance to argue its merits. See id. at *11-*12.

We draw a couple of conclusions from these cases. One is that a settlement officer does not need to consider an outdated OIC that has been rejected or returned because the financial information that supported it is no longer current. A second conclusion we draw from these four cases is that a settlement officer is better off if she asks the taxpayer whether she wants to request collection alternatives as part of the CDP hearing. In three of these cases the taxpayer responded with an OIC, though an incomplete one. The settlement officers then asked for additional information before finally rejecting the OICs. It's not unusual for a taxpayer to make an OIC that's incomplete or that lacks information to support it. But that doesn't mean that the taxpayer hasn't "raised" the issue of

**[\*30]** whether an OIC is an appropriate alternative to forced collection. See

Cavanaugh v. United States, No. 03-250, 2004 U.S. Dist. LEXIS 16896, at \*18

(D.N.J. Mar. 23, 2004). And, once an issue is "raised", section 6330 requires that

the officer who's conducting the hearing "consider" it. Sec. 301.6330-1(e)(3),

Proced. & Admin. Regs. Proper consideration also means that a settlement officer

should ask for more information if faced with a request for a collection alternative

that needs additional information or documentation. See Uribe v. Commissioner,

T.C. Memo. 2014-116, at \*9 ("This illustrates the importance of knowing a

taxpayer's ability to pay when evaluating whether he is eligible for a collection

alternative"); Cavanaugh, 2004 U.S. Dist. LEXIS 16896, at \*29. But when a

taxpayer fails to provide the information needed to consider an OIC, as dozens--

perhaps hundreds--of cases have held, it is not an abuse of discretion for a

settlement officer to reject a collection alternative. See, e.g., Huntress v.

Commissioner, T.C. Memo. 2009-161; Nelson v. Commissioner, T.C. Memo.

2009-108.

So where do the Masons' cases fit in this web of law?

What we hold is that the Masons did make an offer that should have been

considered on its merits by SO Rush. See sec. 301.6330-1(e)(3), Q&A-E1,

Proced. & Admin. Regs. (Appeals will consider "*[a]ny* offers by the taxpayer for

[*31] collection alternatives" (emphasis added)). Not only were the CDP proceedings close in time to when the Masons made their offer to the Centralized Unit, but their offer was physically in front of SO Rush, and it was supported by financial information that was current by the Commissioner's own standards. See IRM pt. 5.8.5.3(2) (Mar. 23, 2018) (financial data should be no more than 12 months old). SO Rush had the full offer packet, Form 656 and all, submitted by the Masons just days before they requested a CDP hearing.

The Masons also explained to SO Rush what they considered special circumstances--that Mr. Mason had retired,[16] and that Mrs. Mason was retiring soon because her work had become laborious, that she lacked the skills and education to find another job, and that she was dealing with a gambling addiction. On top of this, the Masons tried and failed three separate times to borrow against their home so that they could pay down their tax liabilities. Whether or not these reasons would have helped the Masons prevail with the IRS is anyone's guess, but

---

[16] A recently updated provision of the IRM shows the Commissioner takes substantiated, imminent retirement into consideration when calculating a taxpayer's current and future earning potential. See IRM pt. 5.8.5.20(4) (Mar. 23, 2018). While we aren't sure if a similar provision preceded this one, we do know that RO Jacobson didn't find the current retirement of Mr. Mason and nearing retirement Mrs. Mason to be a valid consideration or special circumstance when she sent in her RO report recommending that the they be found to have submitted their OIC "solely to cause delay."

**[\*32]** they didn't even make it into SO Rush's notices of determination or case records, because she simply did not independently review the Masons' offer or their financial situation. If SO Rush felt that she was limited by a lack of information or outdated information, all she had to do was ask for it. See sec. 301.6330-1(e), Proced. & Admin. Regs. ("Taxpayers will be expected to provide all relevant information *requested by* Appeals" (emphasis added)); Uribe, at \*8-\*9; Lloyd v. Commissioner, T.C. Memo. 2008-15 (Appeals officer did not abuse his discretion by requiring taxpayers to submit new OIC instead of reinstating older one). But she did not do this either.

We can't guarantee that taxpayers like the Masons will have their offer accepted or their tax liabilities compromised, but we can ensure that they get a fair shake and that the decisions made by the Commissioner's employees aren't "grounded in an error of law." We therefore conclude that SO Rush abused her discretion by sustaining the proposed collection action without first independently reviewing the Masons' offer.

An appropriate order will be issued.